Booth, Judge,
delivered tlie opinion of the court:
This is a suit to recover the sum of $21,240.30 alleged to be due the plaintiff company because of an alleged íwenue tax assessed and collected by the Commissioner of Internal Revenue under the provisions of section 1000, Title X, of the revenue act of 1918 (40 Stat. 1126), which reads as follow's:
“Sec. 1000. (a) That on and "after Julyl, 1918, in lieu of the tax imposed by the first subdivision of section 407 of the Revenue Act of 1916—
“(1) Every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fail-average value of its capital stock for the preceding year ending June 30 as is in excess of $5,000. In estimating the value of capital stock the surplus and undivided profits shall be included;
“ (2) Every foreign corporation shall pay annually a special excise tax with respect to carrying on or doing business in the United States, equivalent to $1 for each $1,000 of the average amount of capital employed in the transaction of its business in the United States during the preceding year ending June thirtieth.
“ (b) In computing the tax in the case of insurance companies such deposits and reserve funds as they are required by law or contract to maintain or hold for the protection of or payment to or apportionment among policyholders shall not be included.
“ (c) The taxes imposed by this section shall not apply in any year to any corporation which was not engaged in business (or in the case of a foreign corporation not engaged in business in the United States) during the preceding year ending June 30, nor to any corporation enumerated in section 231. The taxes imposed by this section shall apply to mutual insurance companies, and in the case of every such domestic company the tax shall be equivalent to $1 for each $1,000 of the excess over $5,000 of the sum of its surplus or contingent reserves maintained for the general use of the business and any reserves the net additions to which are included in net income under the provisions of Title II, as of the close of the preceding accounting period used by such company for purposes of making its income tax return: Provided, That in the case of a foreign, mutual insurance company the tax shall be equivalent to $1 for each $1,000 of the same proportion of the sum of such surplus and reserves. *699 which the reserve fund upon business transacted within the United States is of the total reserve upon all business transacted, as of the close of the preceding accounting period used by such company for purposes of making its income tax return.
“(d) Section 257 shall apply to all returns filed with the commisioner for the purposes of the tax imposed by this section.”
The Kay Consolidated Copper Company is a domestic corporation incorporated under the laws of the State of Maine. The company is engaged on a large scale in the general mining, milling, and smelting of copper ore. On July 30, 1920, the plaintiff company filed with the collector of internal revenue for the second district of New York, on forms prescribed and in pursuance of regulations adopted by the Commissioner of Internal Revenue, its return upon which capital-stock taxes in accord ivith the foregoing statute were to be assessed. Exhibit B discloses the average sale value of 537,938 shares of the plaintiff’s 1,577,179 shares of common stock outstanding and traded in on the New York Stock Exchange during the calendar year 1919. The computation given and the results obtained were reached by taking the mean of the high and low sales for each month of the calendar year. By this process an average value of $22.067 is accorded to each share, and multiplied by the whole number of shares issued and outstanding gives to the total number of shares a resultant value of $34,803,608.99. Having then reached this claimed demonstrable conclusion the plaintiff company, in a separate note attached to its return, contended that the method employed was and is within the terms of the capital stock tax act and the intent of Congress when the tax was laid upon “ the fair average value of its capital stock for the preceding year.” A check for $34,798 in payment of the tax according to its contention accompanied the return.
The Commissioner of -Internal Revenue declined to accede to plaintiff’s contention, and instead assessed and collected the tax on the basis of the net assets of the corporation. The commissioner gave full credit to all evaluation estimates of the plaintiff with respect to its corporate property save *700 one. The basic .capital oí the corporation is an extensive and valuable copper mine in Arizona. The plaintiff returned this property as worth $8,657,620.28. The commissioner enhanced its worth to $32,282,993.56. The commissioner’s conclusion respecting this item of mining property was predicated exclusively upon a return previously made by the plaintiff, where for the basis of ascertaining income taxes the corporation itself valued the mine at $127,417,291. Subsequently, by the application of a depletion allowance formula put in force by the commissioner, and satisfactory to the plaintiff, the value of the mine was fixed at $93,678,-245.28. Allowing the plaintiff its conceded ratio of depletion and extending the same over a period of six years from March 1, 1913, to December 31, 1919, the commissioner finally fixed the mining property as worth on the latter date $32,282,993.56 for the purposes of capital-stock assessment. The plaintiff in this litigation makes no protest against the proceedings of the commissioner referable to the accuracy of his computation, but the challenge is to the method employed. Therefore it is conceded that if the commissioner was within his legal rights in assessing and collecting the tax upon the fair average value of its net assets, fixed by him after allowing all just credits and debits at $55,828,541.66, it may not recover the alleged overpayment- of $21,240.30 with interest thereon, for which this suit is brought, the plaintiff having paid the same under protest.
It is apparent from the stipulated findings and what has just been said that the single issue involved herein is the construction of the section of the statute authorizing the imposition of the tax. The plaintiff insists that the fair average value of its shares of stock “ based upon bona fide transactions on a large scale in the open market establishes the value of its capital stock for the purpose of the tax,” the defendant, on the other hand, insisting that the term “capital stock” as used in the act has no such restricted meaning; that clearly within the intendment■ of the statute Congress was imposing an excise tax on domestic corporations as going concerns, a tax on the privilege of conducting-business as such, and directed the admeasurement of the same upon the value of such a privilege, ascertainable from *701 the net value of its holdings, its possessions, the things tangible and intangible which concentrated into a single unit are fundamentally its capital stock, from which earnings and dividends are expected to flow. As aptly stated, “ the tools,"’ the instrumentalities available to the management in the prosecution of the corporate enterprise; that no precise, unyielding method, resting upon a fixed standard of evaluation, such as the average market value of the corporation’s shares of stock, is intended by the term “ capital stock,” but that, on the contrary, the generality of the tax, the differing and manifold complexities of corporate organizations, the character of business involved, clearly import a legislative intention to tax “the entire potentiality of the corporation to profit by the exercise of its corporate franchise.”
There are many cases in the books where this identical controversy has been involved. They illustrate with preciseness the seeming flexibility of the meaning of the term “ capital stock.” In both the courts and the financial world the term itself has not assumed a fixed and determined sig; nificance capable of identifying its use as alone applicable to shares of stock of a corporation as opposed to accumulated assets of the same. As a matter of fact, it is frequently used in legislation to indicate one or the other. It may, we think, be said — at least the adjudications of the State courts are' almost uniform upon this point — that in the imposition of property taxes laid upon the capital stock of corporations the term is held to mean the assets of the corporation, its real possessions which the corporation uses and employs in its corporate activities. Pacific Hotel Co. v. Lieb., 83 Ill. 602; Chicago Union Traction Co. v. State Board of Equalisation, 112 Fed. 607; Henderson Bridge Co. v. Commonwealth, 99 Ky. 623; 166 U. S. 150; Security Co. v. Hartford, 61 Conn. 89-101; State v. Duluth Gas & Water Co., 76 Minn. 96; People v. Coleman, 126 N. Y. 433; Adams Express Co. v. Ohio, 166 U. S. 185; First National Bank v. Douglas Co., 124 Wis. 15.
In excise taxing statutes where there are no qualifying terms indicative of an express limitation of the term “ capital stock ” the ambiguity thus arising is resolvable only by recourse to the usual and elementary principles of statutory *702 construction. What did Congress intend when it used the term as it did in this particular law?
The imposition of excise taxes, especially corporate excise taxes, is not a new form of revenue legislation. It has been frequently resorted to by both the State and Nation, and in the course of such legislation the value of the corporation’s shares of stock, its assets, its net and gross income, etc., have been employed as the standard of measuring the tax. As a matter of fact, the factor of its ascertainment rests in the discretion of the legislature enacting the law. Spreckles Sugar Co. v. McClain, 192 U. S. 397; Flint v. Stone Tracy Co., 220 U. S. 107.
By the act of June 13,1898, 30 Stat. 4-48, Congress imposed a special excise tax upon the banking business of the country. A mere reading of the law seems sufficient to confirm the assertion that its policy was rigidly limited to the compu tation of the same upon the basis of capital, surplus, and undivided profits. In other words, the tax was to be measured by the net assets of the bank. The act of October 22, 1914, 38 Stat. 745, continued the banker’s tax of 1898, with changed provisions as to the amount of the imposition, but still adhering to the legislative policy of measuring the tax in accord with the net assets of the bank. Leather Manufacturers National Bank v. Treat, 128 Fed. 262.
In 1916 Congress adopted a more comprehensive policy in the matter of excise tax legislation, and instead of limiting the tax to bankers broadened the scope of the enactment and included all domestic corporations, joint-stock companies, and associations organized for profit and having a capital stock represented by shares. The tax was to be measured upon the basis of “ the fair value of its capital stock, and in estimating the value of capital stock the surplus and undivided profits shall be included.” The act of 1918, which followed the general policy of the act of 1916, substituted as the basis for computing the tax “ the fair average value of its capital stock ” instead of the “fair value ” of the same.
An analysis of this legislation, considered in the light of its inception, as appears from the bankers taxing statute, clearly imports a legislative policy to measure the excise taxes provided for on the basis of the assets of the corpora *703 tion. It was not until 1916, when the field, was broadened and all domestic corporations came within the scope of the capital stock tax law, that doubt in this respect could possibly arise.
In the case of Central Union Trust Co. v. Edwards, 282 Fed. 1008, a case involving the construction of the act of 1916, the plaintiff contended that “ capital stock ” in association with the other provisions of the law clearly meant paid-in capital, surplus, and undivided profits, less liabilities, or, in other words, net assets. It so happened in this particular case that the market value of the corporation’s shares of stock was largely in excess of its book value, due to large and most attractive dividend distributions for some years. The collector of internal revenue, ignoring this contention, assessed and collected the tax upon the basis of the corporation as a going concern, including in his estimate all the factors, both tangible and intangible, which-added to any were possessed by the corporation in the course of its going business. In other words, the collector computed the tax upon the “fair value of total capital stock,” without limiting the computation to net assets. Manifestly this resulted in a largely increased tax. The district judge, in a written 'opinion, sustained the collector and was affirmed by the circuit court of appeals for the second circuit in 287 Fed. 324.
The reasoning of the court in both opinions cited above follows the channel marked out by the Supreme and State courts in construing corporate excise tax laws. Emphasis is put upon the character of the tax, an exaction demanded for a privilege, an imposition laid upon the legal entity known as a corporation and. measured by .its resources, “-the entire potentiality of the corporation to profit by the exercise of its corporate franchise,” and not upon property emanating therefrom but belonging to individuals.'
When the Congress used the expression “ the fair average value of its capital stock,” as it did in 'the act of 1918, it manifested an intent to prescribe an equitable basis for the assessment of the tax, a design to apply justly a tax exaction which, because of its general extent, in pursuance of the taxing policy adopted, was incapable of restraint within rigid rules for ascertainment. “ Fair ” means “ just ”; “ aver *704 age” indicates apportionment. It is not difficult to obtain an average value, and it would appear as a logical inference that the interposition of the adjective “ fair ” was notice that in the adoption of “ capital stock ” as the basic factor for computing the tax it was not always possible to fix its average value, and therefore some discretion, some leeway, must be granted, some room allowed, so that the burden imposed would fall with measurable equality upon all corporations taxed. “Fair value” means market value ordinarily, the amount which sellers are willing to take and buyers to give, and if a fair, open market were always available, it may well be that the fair average value of a corportion’s capital stock is the average of its market value. But the vast majority of domestic corporations do not list their shares of stock upon the New York or local stock exchanges. In fact, an insignificant number do. Many incorporated insurance companies have no shares of stock; others have both preferred and common; in hundreds of corporations the stock is closely held and rarely, if ever, sold. So that it seems to us that Congress was endeavoring in the use of the term “ fair average value of the capital stock ” to formulate a basis for the computation of the tax that would allow the commissioner in its assessment to take into consideration the resources of the corporation, its assets and liabilities, its entire possessions actually at work to produce earnings, the instrumentalities available to its management as a going concern, and from the sum total thus ascertained, strike a fair average value, a value fair to the corporation and to the Government. As said by Mr. Justice Brewer in Powers v. Detroit, G. H. & M. Ry. Co., 201 U. S. 543, 561:
“ Again, the tax is to £ be estimated upon the last annual report of the corporation.’ While such report might be expected to include not merely the property belonging to the corporation but also the number and names of the stockholders and the number of shares held by each, and possibly also the amount paid in by each, yet the word £ estimated ’ carries with it the idea of valuation rather than of mathematical apportionment. It suggests that the property reported by the corporation is to be the basis upon which the assessors shall make their valuation, so that the tax is ‘estimated’ upon that properly rather than fixed by mere *705 process of multiplication or division. * * * Under those circumstances we are o.f the opinion that the tax provided for by section 9 is a tax upon the property of the corporation and not a tax upon the shares of stock held by the shareholders.”
If. as contended for, the market value of the shares of stock is the fundamental and only basis for measuring the tax when available, the word “ fair ” is decidedly meaningless. No difficulties present themselves in ascertaining the real, mathematical average market value, of the same.
Again, the 1918 capital stock act .contains an express provision:In estimating the value of capital stock the surplus and undivided.prófit'9,sikzi£be included.” (Italics ours.) Congress during the whole course of excise tax legislation has persistently and continuously inserted this provision in connection with the term “ capital stock.” Assuredly it may not be said that under any circumstances this clause is to be ignored. It is. indeed, the one plain and unambiguous provision which points out a definite, inflexible factor for entering into the estimate of capital stock. “Shall be included ” is the language of the statute. Obviously, when given effect it precludes the idea of earnings of the corporations as furnishing the basis of computation for the tax. It precludes a consideration of profits, and discloses an intended purpose to use assets — at least assets represented by surplus and undivided profits — as one factor in arriving at the value of capital stock. But it is said that this provision serves a dual purpose. It furnishes a method for ascertaining the value of shares of stock when no market value of the same is available, and it prevents the commissioner from taking the par value of the shares in arriving at his estimate. There is no language in the statute which warrants us in dealing with alternatives. The difficulties in the administration of the law are not before the court for correction. It is no concern of ours whether the market value of shares of stock reflect the paid-in value of the authorized capital and the surplus and undivided profits, or not. The law says, and plainly says, that surplus and undivided profits shall be included in concluding an estimate of capital stock, and it may not be legally administered without their consideration. *706 If the clause was designed to preclude resort to par value, it signally fails in effectiveness, if market value of the shares of stock, Avhen available, is the single standard, for innumerable shares of corporate stock are quoted for years on the stock market and freely offered at less than their par value.
When Congress expressly included surplus and undivided profits in the estimation of the capital stock of a corporation, it necessarily excluded resort to the market value of the shares of stock of the corporation, even when available, as the one and only basis of assessing an excise tax against the same, and. intentionally predicated the assessment of the tax upon an asset basis. Home Savings Bank v. Des Moines. 205 U. S. 503.
Some things said and words used during a running but not prolonged interrogation of the chairman of the committee in charge of the bill in the House of Representatives, just prior to its passage, lend countenance to the plaintiff’s insistence. Taken as a whole, however, it is more impressive as an exposition of opinion as to the detail of administration rather than a construction of the law. In any event, what was said is not sufficiently explicit to turn the issue in this case. No express meaning was definitely given to the term capital stock, differentiating it from shares of stock.
The commissioner’s administration of the law and the regulations promulgated by him in nowise militate against its uniform application. Corporate organizations covers every form of business enterprise, and if we are correct in our view as to the meaning of capital stock, it is manifestly impossible to prescribe a set rule for its ascertainment in each particular instance. The plaintiff company’s organization and business activity illustrate the manifold difficulties. Like many other corporations dependent for prosperity upon extracting elements from the earth, its capital stock is subject to depletion and fluctuation. Therefore it is apparent that what may reflect the average value of capital stock as applicable to one class of corporations may be wholly inapplicable to others of a different character and engaged in a wholly different business. The uniform measure of the tax is the fair average value of the capital stock, and if the regulations and the assessments made by the commissioner re- *707 suit in disclosing the fair average value, it may not be said to be without uniformity because the exact, unyielding basis is not employed in every instance. The plaintiffs contention, if conceded, would not remove the contingent aspect of regulations necessary to administer the law with uniformity or simplify its administration.
The facts in the case of the Central Union Trust Co. v. Edwards, supra, demonstrate the situation. The average market value of the trust company’s shares of stock was $788.75 each, the book value $400 each. So that if two corporations, capitalized at the same amount, paying the same dividends, in one case where market value of its shares of stock is available, would be taxed on the basis of $788.75 for each share, and the other., where market value is not available, on the basis of $400 per share, and this situation was not unusual during the war. In other words, if plaintiff is correct, the tax is computed in some cases upon the average market value of the corporation’s shares of stock, never less than par, and in others upon the assets of the corporation. Whatever else may be said, it is difficult to believe that Congress intended capital stock to mean shares of stock predicated upon market value in one instance and upon asset value in another, differentiating the two by the interposition of sales only.
Capital stock and shares of stock owned by an individual have, and always have had, a distinct meaning. How simple it would have been for "Congress to have used the term “ shares of stock ” or “ shares of capital stock,” instead of “ capital stock,” if it intended the former. If it was not contemplated by Congress to employ the assets of the corporation to measure the tax, why did it use apt words to so indicate? It had before it the act of 1916 containing a descriptive provision, viz, “ having a capital stock represented by shares.” It was familiar with the legislative policy of taxing capital employed and used in corporate business; it knew excise taxes had been measured by income; it knew it had the unrestricted right to select the measure and method of computing the tax; its knowledge of corporate organization was complete, and from what has been said, may we im *708 port into the law the word “ shares,” when the statute reads “ capital stock,” a term when used in connection with corporate taxation is more frequently held to contemplate the actual holdings and possessions of the corporation, its own property, as opposed to shares of stock? More especially is this true when the term itself is considered in connection with the express mandate to include surplus and undivided profits in estimating the tax.
We had prepared and were just on the point of announcing the opinion in this case when the opinion of the Supreme Court in Hecht v. Malley, reached the court. The Hecht case, decided May 12, 1924, 265 U. S. 144, we think, disposes of this one. The opinion follows the decision of the Circuit Court of Appeals in Central Union Trust Co. v. Edwards, supra.
The petition will be dismissed. It is so ordered.
Hay, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.